**CIVIL ACTION NO. 4:13-CV-00127-JHM**

**GARY ERVIN, et al.**                                                                 **PLAINTIFFS**

**V.**

**UNITED STATES OF AMERICA**                                             **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on Defendant's Renewed Motion for Judgment as a Matter of Law under Rule 50(b) [DN 117]. Fully briefed, this matter is ripe for decision. For the following reasons, Defendant's Motion is **DENIED**.

**I. BACKGROUND**

Plaintiffs, the Ervin brothers and their wives, originally filed this suit as a refund action against the Defendant, the United States, seeking a refund of the valuation misstatement penalty and penalty interest payments paid to the IRS on their tax returns in the years 1999 and 2000. As a basis for the suit, the Ervins asserted the reasonable cause defense, in which they alleged that they had reasonable cause to claim their tax losses because they relied in good faith upon the advice of competent tax advisors who advised them to do so. They purportedly relied on four advisors: BDO Seidman (an accounting firm), Curtis Mallet (a tax law firm), Jesse Mountjoy (their longtime attorney), and Martin McElroy (their longtime accountant).

The reasonable cause defense is a "narrow exception" to liability for a tax-related penalty. <u>Kerman v. Commissioner</u>, 713 F.3d 849, 868 (6th Cir. 2013); <u>see</u> <u>Stobie Creek Invs., LLC v. United States</u>, 82 Fed. Cl. 636, 716–17 (2008), <u>aff'd</u>, 608 F.3d 1366 (Fed. Cir. 2010). This defense required the Ervins to prove "by a preponderance of the evidence . . . each of the

following elements with respect to any advisor they claim reliance upon": 1) "The advisor was a competent professional who had sufficient expertise to justify reliance"; 2) "The Ervins provided necessary and accurate information to the advisor"; and 3) "The Ervins actually received advice and relied in good faith on the advisor's judgment." (Jury Instr. 4 [DN 115] at 8.)

A trial was held beginning on March 13, 2017. At the close of proof, Defendant moved for entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) on the theory that because the Ervins never received advice as to the economic substance of the transaction they could not adequately establish their reasonable cause defense. The Court considered and orally denied the motion. From there, the jury concluded that the Ervins reasonably relied on three of their four advisors: BDO Seidman, Curtis Mallet, and Jesse Mountjoy. Defendant has renewed its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), which is now before the Court.

## II. STANDARD OF REVIEW

Fed. Civ. R. 50(b) provides that judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 543 (6th Cir. 2008) (quoting Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 149 (2000)). In reviewing such motions, the Court views the evidence in the light most favorable to the non-moving party and gives him the benefit of all reasonable inferences. West v. Tyson Foods, Inc., No. CIV.A. 4:05-CV-183M, 2008 WL 5110957, at *2 (W.D. Ky. Dec. 3, 2008), aff'd, 374 F. App'x 624 (6th Cir. 2010) (citing Tarrant Serv. Agency, Inc. v. Am. Standard, Inc., 12 F.3d 609, 613 (6th Cir. 1993)). The Court should "not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury."

Hogancamp v. Callaway, No. 5:08CV-00152-JHM, 2012 WL 2994264, at *2 (W.D. Ky. July 20, 2012) (citing Hometown Folks, LLC v. S & B Wilson, Inc., 643 F.3d 520, 530 (6th Cir. 2011); Adam v. J.B. Hunt Transp., Inc., 130 F.3d 219, 231 (6th Cir. 1997); Tarrant, 12 F.3d at 613). "A trial court must affirm the jury verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party." White v. Burlington Northern & Santa Fe R. Co., 364 F.3d 789, 794 (6th Cir. 2004) (quoting Fed. R. Civ. P. 50(a)). In other words, "[t]he district court must 'indulge all presumptions in favor of the validity of the jury's verdict,' and 'should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result.'" Williams v. Nashville Network, 132 F.3d 1123, 1131 (6th Cir. 1997) (quoting Brooks v. Toyotomi Co., 86 F.3d 582, 588 (6th Cir. 1996)).

### III. DISCUSSION

The United States argues that there was insufficient evidence adduced at trial to support the Ervins' reasonable cause defense, arguing: 1) that the Ervins never received any advice from their advisors regarding the economic substance of the transaction; 2) that any advice rendered was based on unreasonable assumptions as to future events by Gary Ervin; and 3) that these three advisors were not independent and therefore incapable of rendering advice upon which the Ervins could have reasonably relied.

To combat this Motion, the Ervins assert that the United States waived its right to bring the first and third arguments because it did not address them in its oral Motion for Judgment as a Matter of Law under Rule 50(a). In making the Rule 50(a) Motion, the United States expressly stated that it wished to preserve and incorporate all arguments made in its pre-trial brief into its Rule 50(a) motion, which include the arguments that the Ervins were never advised as to the economic substance of the transaction and that the advisors were not truly independent. The

Court permitted the United States to do this rather than requiring counsel to detail each argument after the close of proof. Because the Court allowed counsel this flexibility, the Court declines to treat these arguments as waived and will address each of the United States' arguments herein.

**A. Advice Regarding Economic Substance**

The United States first argues that the Ervins never received any advice from their advisors as to the economic substance of the transactions that form the basis of this tax refund suit. Rehashing a familiar argument, the United States begins its analysis by asserting that the transactions lacked economic substance. This issue was previously litigated and conclusively established by the Federal Court of Claims in Jade I, the Court of Appeals for the Federal Circuit in Jade II. Specifically, the Federal Court of Claims held that the "transaction's fictional loss, inability to realize a profit, lack of investment character, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return, compel a conclusion that the spread transaction objectively lacked economic substance." Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 14 (2007) [hereinafter Jade I], aff'd in part, vacated in part, rev'd in part sub nom. Jade Trading, LLC ex rel. Ervin v. United States, 598 F.3d 1372 (Fed. Cir. 2010) [hereinafter Jade II]. The Federal Circuit affirmed, stating "[t]he Ervin LLCs' transfer of the spread transactions to Jade lacked economic substance." Jade II, 598 F.3d 1372, 1377. As seen, these decisions, and the Court's jury instructions that reflected this determination, it is well-understood that the transactions lacked economic substance. (Jury Instr. 2 [DN 115] at 6 ("[T]he transaction failed to meet the economic substance test.").) Much of the parties' briefs are spent discussing whether or not the transaction had economic substance at the time the Ervins executed it. However, this was not the subject of the jury's inquiry and the Court

will not consider these arguments to show that the advisors themselves did not consider and include an analysis of economic substance in their overall advice.

The jury was simply charged with determining whether it was reasonable for the Ervins to rely on their advisors' advice. This advice, as the jury instructions directed, required the advisors to have "considered and concluded whether the transaction held economic substance as a part of their overall advice." (Jury Instr. 4 [DN 115] at 9.) The United States contends that none of the advisors provided any advice regarding a non-tax purpose for the structure of the transactions, and, therefore, the Ervins' reasonable cause defense must fail as a matter of law. Despite this contention, the Ervins presented ample evidence upon which a jury could reasonably conclude that each of the advisors considered and concluded that the transaction had economic substance as a part of their overall advice.

First, Jesse Mountjoy, the Ervins' longtime tax attorney, described in detail how he considered the economic substance of the transaction. He specifically stated that he follows "a general philosophy that says you don't do anything just to be tax motived" and that "profits," "good business," "and a lot of things" besides taxes are important in structuring a transaction. (Trial Tr. Vol. IV [DN 129] at 93:7–15.) He confirmed that, in 1999, he examined the transaction at issue under the economic substance test: he looked at "investment strategy, business planning, and tax" consequences of the paired transaction and determined that the transaction "passed the test." (Id. at 101:16–19.) He further concluded that in terms of profit, he determined that "there was a reasonable possibility of making good profits absent tax aspects," and "there was a clear profit motive involved;" he did not believe that "the tax structure or the structure of the business entity detracted from the profit motive the Ervins engaged in." (Id. at 102:9–15; 107:5–13.) Additionally, he engaged in this independent analysis and determined that

the transaction was based on a business purpose rather than a tax concept alone. (Id. at 233:3–22.) He communicated his advice, including the determination that the transaction had economic substance, to the Ervins by telling them that "this looked like a solid investment and tax-paired strategy going forward." (Id. at 99:22–24; Ervin Trial Tr. Vol. I [DN 110] 97:19–20 ("[H]ad Mr. Mountjoy not been convinced, [Gary Ervin] wouldn't have proceeded with it.").) Therefore, the Ervins presented sufficient evidence such that a jury could reasonably conclude that Jesse Mountjoy considered the economic substance of the transaction and included it in his overall advice.

The United States next argues that BDO Seidman did not actually consider the economic substance of the transactions as a part of its overall advice to the Ervins. This is because, the United States posits, the BDO "opinion cannot constitute advice because it was based on hypothetical facts"; but, even if it could be considered advice, "it does not advise that there is a business reason to purchase the options outside of Jade and then contribute them to Jade"—it generally "does not identify or explain a non-tax business purpose for the structure of the transaction." (Mot. [DN 132] at 9.) The United States focuses on the BDO opinion to prove that BDO did not consider economic substance even though the opinion states that the Ervins had "a reasonable expectation of making a profit on the transactions in excess of all associated fees and costs and not including any tax benefits." (Id.) The United States alleges that there was no other evidence of advice provided to Gary Ervin regarding the non-tax business purpose of the transaction. In so doing, Defendant entirely ignores the advice given by David DiMuzio, Gary Ervin's main contact at BDO.

DiMuzio was an accountant employed by BDO. In this role, he advised the Ervins as to the transactions that form the basis of this tax refund law suit. He took part in many of the

conversations between BDO, Sentinel (an investment banking firm that participated in the Jade partnership), and the Ervins. (DiMuzio Trial Test. [DN 137-4] at 1543:4–17; 1544:5–15.) DiMuzio characterized the transaction as being a "dual purpose investment," as "there were tax advantages associated with the investment there were questions raised about tax principles that were involved." (Id. at 1514:6–10.) He advised the Ervins and their advisors on these aspects of the transactions extensively throughout 1999. (Id. at 1513:16–25; 1514:1–21.) DiMuzio understood from these discussions and believed, as an accountant, that the Ervins could double their money on the purchased and written options that were part of the initial capital contribution. (Id. at 1545:12–22.) In the partnership, he understood that the Ervins stood to gain "upwards of 38 to one" on their investments, which could yield "several million dollars on a return." (Id. at 1545:24–25; 1546:1–19.) On average, the Ervins could expect to gain "14 to one . . . for a significant percentage of time." (Id. at 1547:1–4.) As a professional accountant, DiMuzio explained that this meant that, when taking the Ervins' investments together, at a 10-to-one ratio, the expected return would be "over $6 million," at 14-to-one, the expected return would be "$10 million," and at 38-to-one, the expected return would be "$25 million." (Id. at 1547:16–22.)

DiMuzio's testimony indicates that he understood the mechanics of the transactions and considered the economic substance and profit potential when advising the Ervins. DiMuzio explained to the Ervins the concepts in the BDO opinion, which included the tax principle that a transaction must have economic substance distinct from the tax reduction in order to be proper, all while believing that the transactions at issue had the potential to produce sizable returns. As such, the Ervins proffered adequate evidence such that a reasonable juror could find that BDO, by and through DiMuzio, provided advice that considered and concluded whether the transaction had economic substance as a part of its overall advice.

Lastly, with respect to Curtis Mallet, the United States principally argues that the opinion letter rendered by Curtis Mallet did not include any independent assessment of the potential profits or economic substance. The opinion letter states:

> You determined that its investments in foreign currency, foreign currency options, and the Partnership had a reasonable possibility of profit after expenses and fees (including the fees under the Consulting Agreement even if such fees are attributable to your Partnership interest). Therefore, it is more likely than not that the transactions had a subjective business purpose.

(Jury Trial Ex. 90 at 92.) Rather than conducting its own analysis and considering the profit potential, the United States contends that this letter establishes that Curtis Mallet exclusively relied on Gary Ervin's assessment of the economic substance of the transaction.

However, this argument fails for the same reason the United States' argument failed as to BDO. Aside from the opinion letter, William Bricker, the Ervins' chief contact at Curtis Mallet, advised Gary Ervin that there were economic gains to be made from the transactions in question outside of tax avoidance. At the beginning of their relationship, Gary Ervin called Bricker and asked Bricker to prepare an opinion letter as to the tax consequences as to currency trading transactions. (Bricker Trial Test. [DN 137-2] at 927:12–15.) Bricker disclosed how he dealt with some of his prospective clients in his testimony given during the Jade I trial. He stated that when working with prospective clients, he would first determine their motivation in entering into certain types of currency transactions. (Id. at 929:17–23.) When he felt that they were motivated only by tax avoidance, he declined to work for them. (Id. at 930:3–6.) Bricker did not decline working with the Ervins and instead worked closely with Gary Ervin regarding the transactions at issue. Therefore, it appears that Bricker knew and understood that the Ervins were not solely seeking to avoid paying taxes and instead sought to derive pecuniary gain from the currency transactions.

Further, it was Bricker's opinion "that even if you took all the New Vista fees, the AIG opening account fees, the opinions, the fees that were paid to us and what other transaction costs there may have been, which I don't think were very significant, there was still an opportunity to have a net cash-on-cash economic profit." (Id. at 939:13–19.) Specifically, Bricker asserted that he had confidence in the opinions that he authored for the Ervins regarding the tax consequences of the transactions and that he had confidence in the discussions that he had with them about the economic substance of the transactions and the reasonable expectations of profit. (Id. at 1023:16–22.) He was convinced that the conclusions and representations that he made to the Ervins were reasonable in light of the information available and relayed to the Ervins that he believed that these facts regarding the economic substance and profit expectations were reasonable. (Id. at 1023:19–25; 1024:1–2.) His confidence was based on the "enormous amount[] of time and effort" he spent developing the basis for the opinions that included "an exhaustive review of any number of cases, and rulings, regulations, Helmer, et cetera." (Id. at 940:6–11; 942:13–15.) Though the Curtis Mallet opinion may not have provided the necessary and conclusive advice necessary for the reasonable cause defense, Curtis Mallet's employee and the Ervins' advisor, Bricker, did "consider and conclude" that the transactions at issue had independent economic substance for the jury to find reasonable reliance on this advice.

Overall, the Ervins put forth sufficient evidence as to show that the Ervins' advisors rendered advice that contemplated and verified the economic substance of the transactions at issue. Therefore, it cannot be said that the jury rendered a clearly erroneous decision based on the proffered evidence. As such, the Court will not disturb the jury's verdict by granting Defendant's Motion for Judgment as a Matter of Law on this issue.

**B. Advice Based on Unreasonable Assumptions by Gary Ervin**

Alternatively, the United States argues that even if the Ervins had been adequately advised regarding the economic substance of the transactions, this advice could not support a reasonable cause defense because it was based on unreasonable assumptions. The Court instructed the jury that the advice given "must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." (Jury Instr. 4 [DN 115] at 10.) For example, "[t]he advice cannot be based on a representation or assumption that the Ervins knew, or had reason to know, was unlikely to be true, such as an inaccurate representation or assumption as to their purpose for entering into a transaction or for structuring a transaction in a particular manner." (Id.) While the United States disagrees with the jury's conclusion on that subject, there is ample proof in the record to support the jury's finding that this advice was not based on unreasonable assumptions.

Specifically, the United States asserts that because the Ervins stood to make a de minimus profit despite enormous investment costs, their assumptions about the transactions and future events in regards to the transactions were manifestly unreasonable. In its Motion, the United States walks the Court through the transactions in which the Ervins participated, attempting to show how the Ervins only had the chance to make minimal profits at best. After the first transaction, the United States contends, the Ervins could only have made $0.01 profit on the investment. Even more, if the Ervins were to reinvest in multiple options by leveraging multiple reverse knockout options by reinvesting positive returns into additional reverse knockout options, the Ervins could only have made $28,652 each assuming that they purchased 25 reverse knockout options. The United States calculated this by using a 14-to-1 return ratio.

The United States presented this evidence to the jury, and, in so doing, explained the fees and potential profits.

However, the jury found that the Ervins' assumptions about the transactions were not unreasonable, as they rendered a unanimous verdict reflecting that finding. The Ervins presented much evidence that their assumptions were in fact reasonable: three independent tax advisors reviewed the transactions and determined that they were reasonable; Gary Ervin had experience with similar transactions and understood the profit potential; the United States' figures did not represent the Ervins' beliefs in the profit potential; and, the United States' calculations do not account for certain temporal factors.

First, as discussed in Part A., *supra*, the Ervins' advisors considered the economic substance of the transactions, including the assumptions the Ervins made as to profit potential, independently determined that the transactions were reasonable, and structured their advice as such. This meant that they did not base their advice on any assumptions that they considered to be unreasonable. Because the advisors did not challenge the transactions or indicate that they were unreasonable, their review goes to show that the assumptions contained within were not patently unreasonable.

Second, Gary Ervin testified that he planned on making large profits from the transaction based on his experience with similar transactions. He explained that he had experience with options from his investments in Dycom stock, which gave him confidence that he could see another one hundred percent return on his investment rather than the paltry returns the United States claimed he would make. (Trial Trans. Vol. V [DN 123] at 13:4–10.) Gary Ervin was convinced that the paired Euro options presented high chances for large profits because of his familiarity with the concept of restriking from his Dycom stock trades. (Trial Trans. Vol. I [DN

110] at 66:8–18.)  His positive past investment experience afforded him special knowledge and awareness that aided the formation of his foundational assumptions as to the validity and reasonableness of the transactions at issue.  The fact that his experience led him to believe that he was participating in a sound investment certainly weighs in favor of reasonableness.

Third, the United States' calculations reflect figures that do not correspond with the assumptions that Gary Ervin made.  Instead, the figures that the United States utilized were those that Gary Ervin considered to be part of the "worst case" scenario rather than what he actually expected to make on the spread transactions.  (Trial Trans. Vol. V [DN 123] at 15:1–11.)  To support the reasoning behind his expectations, he explained that the Euro increased by eight percent after executing the option transactions after September 29, 1999.  (Trial Trans. Vol. I [DN 110] at 105:24–25; 106:1–3.)  Based on this success, the Ervins then joined the Jade Trading partnership and contributed the spread options on October 6, 1999, and once again the Euro increased by eight percent.  (Id. at 106:4–6.)  That means the Euro increased sixteen percent in the first two weeks, so the partnership purchased a knock-out option on October 13, 1999 for $100,000.  (Id. at 106:7–13.)  The Ervins expected to see between a 14-to-1 and a 30-to-1 return on that investment on this option, which would yield over three million dollars.  (Id. at 106:14–19.)  Though the Euro began to decline at that time, and the Ervins could not execute the multiple knock-out options they had hoped to, they still presented sufficient evidence to show that they based their actions on reasonable profit-making assumptions from actual market conditions rather than transparently unreasonable assumptions.

Lastly, the United States' argument appears to be somewhat temporally flawed.  It attempts to lump all of the fees and costs associated with creating the partnership and executing the transactions together with the actual returns and potential returns when deriving its meager

profit figures.  In reality, the Ervins entered into the first paired option transactions on September 29, 1999 when the Euro was rising in value.  (Trial Trans. Vol. I [DN 110] at 101:6–14.)  At the time the transactions were executed, the Ervins were still negotiating the fee for the New Vista consulting agreement and did not wind up entering into that agreement, which included the agreed upon fees, until October 6, 1999.  (Id. at 103:6–9; 105:18–25.)  Gary Ervin even negotiated the terms of the consulting agreement so that he paid $225,000 when the agreement was signed, another $225,000 at the end of the year, and the final $225,000 at the end of the following year.  (Id. at 105:11–17.)  Clearly, the Ervins did not intend on fronting the entirety of the consulting fee at the outset of the transactions as the United States has assumed in its calculations.

In conclusion, the Treasury Regulations state that in order to establish a reasonable cause defense, the advice given by the advisors must not be based on unreasonable assumptions.  Gary Ervin had determined, with the help of Sentinel and New Vista (investment firms), that he stood to make substantial profits on his knockout options, between 14-to-1 and 30-to-1 returns. Unreasonable assumptions are illustrated by an example in the Regulations: "the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner." 26 C.F.R. § 1.6664-4.  Nothing in the record indicates that the Ervins knew or had reason to know that the profit representations were untrue or that the Ervins structured the transactions in a nefarious manner, as Gary Ervin explained at great length his past experience with complex transactions, his desire to make substantial profits, and his expectation of large returns.  The jury heard this evidence in full and credited the Ervins' testimony.  The jury determined that the

Ervins did not make unreasonable assumptions and that the Ervins' advisors did not base their advice on these unreasonable assumptions. As such, the Court will not disturb this finding.

### C. Advisors' Independence

Lastly, the United States argues that the advisors did not render independent advice to the Ervins regarding the transactions at issue. The United States contends that the Ervins knew or should have known that BDO and Curtis Mallet were promoters and that Jesse Mountjoy did not perform any independent analysis as he simply vouched for the validity of the Curtis Mallet opinion.

### i. Promoters: BDO Seidman and Curtis Mallet

With regard to BDO and Curtis Mallet being promoters, the jury was instructed that "reliance on the advice of an advisor is not reasonable if the taxpayer knew, or should have known, that the advisor had an inherent conflict of interest, such as that of a promoter of the transaction." (Jury Instr. 4 [DN 115] at 10.) Specifically, "[a] promoter of a transaction is an advisor who participates in structuring a transaction or is otherwise related to, has an interest in, or profits from the transaction. An advisor is not a promoter of a transaction when he has a long-term and continual relationship with the taxpayer, does not give unsolicited advice regarding the tax shelter, advises only within his field of expertise, follows his regular course of conduct in rendering his advice, and has no stake in the transaction." (Id.)

#### a. BDO Seidman

The United States contends that "there is no dispute that BDO promoted the Son-of-BOSS shelter to the Ervins . . . [and] Curtis Mallet helped BDO structure the transaction." (Mot. [DN 132] at 26.) BDO marketed the tax shelter to the Ervins using the model opinion in an effort to win the Ervins' business. (Id.) It further argues that the Ervins knew or should have

known of BDO's status as a promoter because David DiMuzio, of BDO, stated that he believed that, in their "preliminary discussions," he mentioned to Gary Ervin that Sentinel was paying some amount to BDO." (DiMuzio Dep. [DN 137-5] at 297:4–8.) However, Gary Ervin testified to the fact that he did not think that BDO was going to be paid for their efforts outside of the tax preparation that they would perform later that year. (Trial Tr. Vol. II [DN 111] at 117:12–19.) He explained that when he was discussing the transactions with BDO, he had not yet decided to engage with them and fees were never discussed. (Id. at 117:23–25; 118:1–2; 119:1–7.) Further, he did not inquire into why BDO was going through this effort to set up the transactions because many brokers drove from New York to Kentucky in an attempt to win his business and they were not compensated for their efforts, so Gary assumed nothing was out of the ordinary in regards to BDO. (Id. at 118:7–12.) The jury also heard testimony from Jesse Mountjoy, the Ervins' longtime attorney, and Martin McElroy, the Ervins' longtime accountant, who both testified to the fact that BDO never, despite its obligation to reveal potential conflicts of interests to clients, disclosed that BDO had some form of conflict in the transactions in question. (Trial Tr. Vol. IV [DN 129] at 67:10–14; 169:3–14.) Most poignantly, Gary Ervin stated that BDO never communicated to the Ervins that it was receiving undisclosed payments from the transactions at issue. (Trial Tr. Vol. II [DN 111] at 59:21–23.)

As seen above, the Ervins submitted competent evidence illustrating the fact that they did not know that BDO was not a promoter and had no disclosed conflicts of interest. From that, the jury considered the Ervins' testimony, their advisors' testimony, and DiMuzio's testimony (representing BDO). They weighed the conflicting evidence and credited accordingly. Because the record supports the jury's finding, the Court will not disturb it.

**b. Curtis Mallet**

With regard to Curtis Mallet, the United States asserts a similar theory. In essence, it posits that BDO and Curtis Mallet had a business relationship such that the two firms were working together to promote and profit from the transactions. (Mot. [DN 132] at 27.) The United States argues that the Ervins knew or should have known of this conflict because DiMuzio of BDO recommended that the Ervins get advice from Bricker of Curtis Mallet, Bricker was familiar with the transactions and seemingly had a business relationship with BDO, and the Curtis Mallet opinion letter essentially adopted the BDO opinion whole cloth. (Id. at 27–29.)

As to the first point, the United States argues that the Ervins knew or should have known that Curtis Mallet was promoting the transaction because BDO recommended Curtis Mallet to Gary Ervin. However, Gary Ervin did not blindly follow BDO's suggestion to obtain legal advice from Curtis Mallet regarding the transactions at issue. Instead, he sought the opinions of Vickie Davis (the Ervins' general counsel), Jesse Mountjoy (the Ervins' longtime attorney), and Mel Shralow (New York based tax attorney with whom the Ervins were familiar). (Trial Tr. Vol. I [DN 110] at 83:17–25; 84:1–25; 85:1–2.) Each of these attorneys researched Curtis Mallet and determined that the firm was reputable and had specialized knowledge so as to properly and knowledgeably advise the Ervins in regards to the Euro call options. (Id.) Specifically, Shralow advised Gary Ervin that Curtis Mallet would be a suitable firm for this particular type of transaction. (Id. at 85:3–9.) Gary Ervin explicitly opted for Curtis Mallet over White & Williams (with which he was familiar) because Curtis Mallet had "a lot more experience in this type of trading," "represented that a lot of cases that were using [their] opinions" and represented that it "was the one who represented whoever that won the cases." (Id. at 85:24–25; 86:1–2.) Gary felt very confident in Curtis Mallet and felt he was "in good

16

hands." (Id. at 86:4–5.) This evidence points to the fact that the Ervins did not know that Curtis

Mallet was engaged in a business relationship with BDO, as the Ervins specifically researched

Curtis Mallet to ensure that it was a suitable firm to handle these transactions. Had the Ervins

known that BDO and Curtis Mallet were acting in concert, they likely would have sought outside

counsel still, as Jesse Mountjoy specifically advised the Ervins to get legal advice from a firm

independent from BDO.[1] (Trial Tr. Vol. IV [DN 129] at 112:13–24.)

As to the second two points, the United States argues that the Ervins should have known

that Curtis Mallet had a conflict of interest because of Bricker's familiarity with the transactions

and because the Curtis Mallet opinion was similar to the BDO opinion. Despite these assertions,

Bricker assured Gary Ervin emphatically that he was loyal only to the Ervins, specifically stating

that he did not represent BDO or Sentinel—he only represented Gary and his brothers. (Trial Tr.

Vol. II [DN 111] at 12:8–21.) Bricker did not disclose that he had any conflicts with Gary,

including that he did had a business relationship with BDO. (Id. at 12:19–21.) Gary Ervin took

this as true because of his experience with attorneys and their duties to run conflicts checks and

to disclose any conflicts of interest that may result. (Id. at 12:22–25; 13:1.) He even confirmed

with Jesse Mountjoy and Vickie Davis individually that Bricker could not be invested in the

transactions because it would present a conflict of interest that should have been disclosed. (Id.

at 113:19–20.) Gary testified that he "had a very high opinion of the ethics of [Bricker]," so he

believed what Bricker told him and moved forward with the transaction as such. (Id. at 113:9–

20.) These undisclosed conflicts even led to the Ervins filing suit against both BDO and Curtis

---

[1] The United States cites Salem Fin., Inc. v. United States to support the proposition that a taxpayer cannot rely on advice from an advisor who was recommended to the taxpayer by the promoter of the transaction. 786 F.3d 932, 958 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 1366, 194 L. Ed. 2d 359 (2016). True enough, an advisor recommended by a promoter creates a conflict of interest of which a taxpayer knows or should know. However, here, the Ervins presented sufficient evidence to show that they did not know and should not have known that BDO was a promoter. Therefore, because BDO was not known to be a promoter, the inherent conflict of interest could not be imputed onto Curtis Mallet as it was in Salem.

Mallet.  (Id. at 47:1–3.)  Therefore, despite the unclear business relationship between BDO and Curtis Mallet and the similar opinion letters, Gary Ervin has shown that he reasonably believed and trusted that Bricker was wholly independent from BDO, had no conflicts of interest, and was not a promoter.

The jury heard this testimony from Gary Ervin and Jesse Mountjoy regarding the research Gary performed in selecting Curtis Mallet and testimony from Gary Ervin regarding Bricker's loyalties to the Ervins.  The Ervins presented sufficient evidence for the jury to conclude that the Ervins did not know and should not have known that Curtis Mallet had a conflict of interest in or promoted the transactions at issue.  Therefore, the Court will not disturb this finding.

### ii.  Independent Analysis: Mountjoy

The United States additionally argues that Jesse Mountjoy, the Ervins' longtime attorney, rendered advice upon which the Ervins unreasonably relied because he did not perform an independent investigation into the economic substance of the transaction or its tax consequences. Instead, the United States asserts that he simply relied on the information and analysis contained within the BDO and Curtis Mallet opinions, agreed with the opinions, and vouched for them in representations made to the Ervins.

With regard to this argument, the jury was instructed that in order to be successful on their reasonable cause defense, "the Ervins must show that the advice came from a competent professional with sufficient expertise to justify reliance."  (Jury Instr. 4 [DN 115] at 8.)  This means that "the advisor must have evaluated the merits of the claimed tax deductions, and reached an independent decision as to the proper tax treatment of the transaction."  (Jury Instr. 4

[DN 115] at 9.) Moreover, the advice rendered "must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." (Id.)

The United States principally relies upon both Gary Ervin's and Jesse Mountjoy's characterization of Mountjoy's role. Both stated that Mountjoy was to critique and second-guess the BDO and Curtis Mallet opinions. (Mot. [DN 132] at 29.) Because this was his primary role, the United States explains, Mountjoy simply rendered an opinion on an opinion, and he performed no independent analysis. (Id.) To this end, the United States cites Mountjoy's testimony in which he states that he "came to the conclusion that the Curtis Mallet opinion and the supporting documents were good, solid law based upon what I understood the law and the tax law to be at the time." (Id. at 30 (citing Trial Tr. Vol. IV [DN 129] at 33:20–25; 34:1).) Additionally, Mountjoy suggested that the Ervins seek advice from a specialist that he could critique, as he thought that he was best suited for rendering advice in that capacity. (Id. at 30–31.)

Though the United States arguments are well taken, the Ervins presented considerable evidence that Mountjoy rendered independent advice apart from the BDO and Curtis Mallet opinions. Mountjoy testified that between August and September of 1999 he independently researched the law contained within the BDO opinion, specifically by pulling and reading all relevant cases cited within. (Trial Tr. Vol. IV [DN 129] at 15:6–9.) Mountjoy formed and discussed his conclusions as to these cases during the meetings with DiMuzio, Gary Ervin, and Martin McElroy in a meeting on September 2, 1999, that lasted around five hours. (Id. at 12:3–8.) During this meeting, Mountjoy discussed with the group the economic substance of the transactions based on the rule that "a transaction would be respected unless there was no business purpose and no reasonable possibility of profit." (Id. at 16:6–18.) Based on his

research and understanding of the law, Mountjoy was satisfied with DiMuzio's and BDO's opinion on the transactions at issue. (<u>Id.</u> at 14:13–17.) At the end of the meeting, Mountjoy believed that the investment had "good tax legs to it, so to speak" and that the tax rules would work to their advantage immediately and down the road after the Ervins exited the partnership years later. (<u>Id.</u> at 22: 5–15.) As a part of his continuing involvement, Mountjoy received all of the investment documents that the Ervins received as well. (<u>Id.</u> at 26:12–21.)

In the spring of 2000, the Ervins also engaged Curtis Mallet to provide an opinion as to the tax treatment of their transactions. (<u>Id.</u> at 28:5–9.) Mountjoy had encouraged the Ervins to seek advice from a specialist who had experience with these types of complex transactions, as to best advise the Ervins in a cost-effective manner. (<u>Id.</u> at 29:12–19.) Though Mountjoy had suggested that the Ervins seek further advice, Mountjoy remained involved. (<u>Id.</u>) His role was to verify the opinion of the specialists at Curtis Mallet by drawing on his own independent judgment, as he believed that was the best way to get a "good product." (<u>Id.</u> at 29:20–25; 301–6.) After independently analyzing the Curtis Mallet opinion, Mountjoy gave Gary Ervin his own opinion and conclusions as to the validity of the law and analysis contained within the opinion and stated that he agreed with Curtis Mallet's representations. (<u>Id.</u> at 33:20–25; 34:1–22.) During the trial Mountjoy recounted his understanding of the tax law and how the transactions fit into that framework by describing the documents and cases he reviewed and how he reached his conclusions. (<u>Id.</u> at pg. 38–62.)

In sum, Mountjoy considered documents provided by the Ervins, case law, and tax law in order to render the best advice possible upon which the Ervins could rely. (<u>Id.</u> at 64:23–25; 65:1–25; 66:1–12.) To this end, he extensively studied option and currency investments by reading relevant literature on the subject. (<u>Id.</u> at 69: 2–10.) After all of his efforts, Mountjoy

concluded that he gave the Ervins accurate, independent advice based on his analysis of the law at that time.  (Id. at 66:13–15.)  To this end, he testified that he performed an "independent review of the materials," made "independent inquir[ies]" into the legitimacy of the investment, and gave "independent conclusions."  (Id. at 68:19–25; 69:1–19.)

Ultimately, it was the role of the jury to hear the evidence and testimony presented and to decide how much weight to award a witness's testimony.  Here, the Ervins presented evidence that Mountjoy performed an independent analysis and did not unreasonably rely on any other advisor's opinion, and the jury weighed and credited this evidence in the Ervins' favor.  Because sufficient evidence was presented to support this finding, the Court refuses to disturb it.

Despite the United States' arguments to the contrary, the Court concludes that the Ervins presented evidence and testimony to support each of the jury's findings.  Accordingly, because the verdict has a legally sufficient basis and is not seriously erroneous, the Court will not overturn this result.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law is **DENIED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

August 23, 2017

cc: counsel of record